Mr. Martin. Mr. Chief Justice, and may it please the Court. The question this case presents is whether the Restoration Act subjects the Pueblo to Texas' time, place, and manner restrictions as it relates to games that Texas does not flatly prohibit. It does not. In the Restoration Act, Congress codified the Cabazon ban framework and specifically foreclosed Texas' regulatory authority over the tribe's gaming activities. The plain language of the Act provides us with clear support for this interpretation. On the heels of this Court's decision in Cabazon, Congress changed the language of the Restoration Act to replicate the prohibitory-regulatory dichotomy struck in Cabazon. Section 107A incorporates the Cabazon framework. It federalizes Texas' law, but only as to prohibited games. And bingo, in the state of Texas, is not a prohibited game. Section 107B clearly forecloses any interpretation of Section 107 in its entirety where Texas would have regulatory jurisdiction over tribal gaming. And Section 107B must have meaning in the Act. The problem with the state of Texas' interpretation and the Fifth Circuit's interpretation in Isleta I is that it reads 107B out of the Act entirely. This interpretation is also consistent with Congress' extension of the Cabazon framework to IGRA. The two statutes are not in conflict, and you don't have to choose one over the other. And even if that were the case, and we don't think it is, the plain language of the Restoration Act allows my client to engage in non-prohibited gaming activities. In Sections 107A and 107B, Congress was sending the clear signal that it was incorporating the prohibitory-regulatory construct from Cabazon into a test applicable to these tribes. The final text of the Restoration Act reflects the bargain that Congress struck. Each side got something, but not everything. Texas was allowed to prevent prohibited games from being played by these tribes. Meanwhile, the tribe was allowed to retain its sovereignty and its freedom from regulation as it related to gaming activities. And with that, I'd be pleased to answer any questions from the Court. Yes, Counsel. The Cabazon was a grant of jurisdiction, right? Yes, Your Honor. Is there any difference? Is there a grant of jurisdiction in 107A? Your Honor, looking at the text of 107A, it's specifically dealing with the tribal gaming activities. There's not a specific reference to the grant of the jurisdiction. So just standing alone, what do you think it's doing? Your Honor, I think it's dictating, it's showing that Congress was extending the Cabazon framework to this fact pattern where Congress was federalizing state law as to prohibited gaming activities. It's taking the public law 280 structure that was explicated in Cabazon and extending it to this fact pattern. So exactly how is it doing that? Your Honor, in the text itself, the first sentence, all gaming activities which are prohibited by the laws of the state of Texas are hereby prohibited on the reservation and on the lands of the tribes. That seems almost as though it's adopting it as federal law. It's adopting Texas's prohibitory laws as to prohibited gaming activities. One of the things that's interesting, Your Honor, is that compared to previous versions of this act, one of the final changes in section 108 was changing it from gaming and gambling in those broader terms to the concept of gaming activities and specifying prohibited gaming activities. Well, I mean you say that 107 was enacted in light of Cabazon, but it was directly enacted in light of the tribal resolution which said that the tribe was willing at this point after all the back and forth, they obviously weren't happy about it, but they were willing to provide that all gaming, gambling, lottery, bingo shall be prohibited. All, regardless of whether there's some that's permitted and some that's not, according to the laws of Texas. So, I mean, this is an odd case. I haven't seen in decades briefs that were so full of legislative history and, you know, pre-enactment this or post-enactment that. But, I mean, if that's what we're going to, if that's the game that's on, I mean, it looks to me like the tribal resolution had a much more direct connection to the legislation that was actually passed. Your Honor, if I may, I think the tribal resolution had a much more direct connection to previous versions of it. And I would agree with you, there's a lot of legislative history in here and some of it's legislative history and some of it is almost textual evolution on what was actually enacted. And one of the things that I would point out to Your Honor is the tribal resolution, which again was dated March 16th of 1986. That total ban, or what the state of Texas calls the quote unquote operative request, and that would have been a total ban. There's no way to deny that. However, that part of the text was incorporated into the Restoration Act into a version that never actually passed. And that was a version that was set forth in our brief on page 9, Your Honor. That version was September 23rd of 1986. Now that's interesting because Cabazon comes down and Cabazon is handed down on February 25th, 1987. So well after that version, which reflected the tribal resolution, was handed down. Well do you think the law would have been passed without the tribal resolution, regardless of the particular form that it was enacted? Your Honor, I think I'm focused on the law that was actually passed and the changes that were made by Congress. I don't know that I want to speculate on what would have happened or would not have happened. All I know is we have the text that we have. And the point that I was going to make was the final version of it is the one that no one here thinks that the final version in 107A is a total ban. There's no way you can construct it to where it reflects a total ban. So it can't reflect what Texas calls the quote operative request. It has to mean something else. And those final changes that were made to 107A talk about the prohibited gaming activities. And that's a different story than the prohibited gaming. And Your Honor, if I'm not wrong... I don't know who you're including and everybody here, but it says prohibited. And if you had, under Texas law, you can have bingo games up to $100 at stake. And then what's happening is the tribe is having bingo games up to $1,000. Now, if you told somebody that, that they have games up to $1,000, it would be perfectly natural for that person to say, well, that's prohibited because there's a $100 cap. And you would tell me that, no, you would say they would be able to have the bingo games up to $1,000. Your Honor, those are the exact type of restrictions that this court analyzed in Cabazon and determined to be regulatory. And we believe that that's the exact same application that Congress would... I'm sorry, Mr. Martin, but I think what the Chief Justice is suggesting is that it's not the normal use of the term prohibited. What you're really relying on is the idea that Cabazon turned this language into a kind of term of art. And that Congress was aware of that and that when Congress used the word prohibited, it was incorporating this distinction that had been made in Cabazon. And let's say that your argument really does depend on that. It's not the normal use of the word prohibited. It's a Cabazon use of the word prohibited. So then the question is, what's your best evidence that Congress, when it passed the statute, really did have Cabazon in mind rather than was using the normal use of the word prohibited? Your Honor, first of all, I think that under Williams v. Taylor, we certainly can assume that Congress was taking language from one of this court's opinions and incorporating it, especially in the exact same context of Indian gaming, and that they knew what it meant. The second aspect on how I would answer your question, Your Honor, is that under 107A, we set up the prohibited structure. And then in 107B, we set up the restriction on Texas's regulation. And I think that that clearly evidences... I don't really see 107B as doing that. I mean, if I look at 107B, it seems to me like much more of kind of the mirror image or flip side of 107C. It says, you know, the federal courts have jurisdiction in 107C. And in 107B, it says the state courts don't have jurisdiction. So on that reading, 107B doesn't really help you, does it? I think 107B helps us greatly, Your Honor, and I think that's the issue that we had with the Fifth Circuit's opinion. Regulatory jurisdiction within 107B is hearkening back to the broader term of the state's inability to tax, regulate, license. It's the Bryan v. Itasca County test. They don't have that regulatory authority. Whereas in 107C, in the title alone, it says jurisdiction over enforcement. I don't think that you can combine, and this is where I respectfully disagree with my friends from the state of Texas. I don't think you can combine 107B to say that's enforcement. I think that's confusing jurisdiction. Can we go back to the first way you answered the question? Because your first sentence was something like, you know, we presume that Congress knows about the law. And, you know, sometimes we do, and then again, sometimes we don't. Do you have a view of when we should make that presumption and why this case fits within that sphere? My view, Your Honor, would be that if Congress is using the exact same language, such as the use of the word prohibit, you can then dictate that whether you call it a term of art or using the same term in the exact same context. Counsel, prohibit, though, how many times does prohibit appear in the code? And, you know, one of the briefs counted how many times. I mean, it's not a term of art in that sense, right? It is a term of art, Your Honor, when it's six months after Kavazan and you're talking about Indian gaming. That would be the distinction I would make. I believe that the cite that they gave you, and that was the State of Texas' brief, it talked about it appearing 8,800 times. But what would they have – if you were in Congress and you were aware of Kavazan and you wanted to use prohibited in the normal sense of the word, and you said, well, I'm afraid that if I use this word prohibited, people are going to think it has the Kavazan meaning, what would you have – how would you have written this? Well, Your Honor, if I – I would answer it by saying I think that we're talking just about prohibited and the use of the word prohibited. We also need to see what it modifies, which is prohibited gaming activities, because that was another change. Well, maybe – what synonym would you have used? All gaming activities which are, what, I better say forbidden. I shouldn't say prohibited. Is that the argument? Your Honor, my submission would be that by using the word prohibited in 107A and then using no regulatory jurisdiction in 107B, that it was clear that they were intending to implicate Kavazan. So do you lose without Kavazan? No, Your Honor, I don't think you lose without Kavazan. If you take Kavazan out and we're just looking at the ordinary meanings of these words, prohibited and regulatory jurisdiction, you think you still win? Your Honor, to prohibit under the ordinary meaning is to forbid. Bingo is not forbidding in the State of Texas. Counsel, why are you relying just on Kavazan? Bryan, in 1976, used the dichotomy of prohibited versus regulatory. Correct? Yes, Your Honor. And said in the Indian context, regulatory doesn't mean prohibited. Correct? Absolutely. Yes, Your Honor. So you're not talking about six months before. You're talking about 10 years before. Yes, Your Honor. And secondly, why are you not pointing to the examples of legislation passed on the same day as the Restoration Act? The WANAPOG passed on the very same day and it used regulations, those laws and regulations, which prohibit or regulate. The Seminole, also passed in 1987, also talked about prohibiting and regulating. Correct? Yes, Your Honor. When Congress wants to use the words regulations in this context, it certainly knows how to. Mr. Martin, it showed you it did. Yes, Your Honor. Counsel, could I just ask, if you were to prevail, would Indian gaming be completely free-for-all or would the Pueblo still be subject to IGRA? We believe that the proper reading of the Restoration Act is that the Pueblo would still be subject to IGRA. It's one of the other issues we have. So what's the upshot of that? As I understand it, bingo may be allowed, for example, but blackjack wouldn't. Is that about right? Class 3 gaming would still be forbidden? In a general sense, yes, Your Honor. Class 3 would still be subject to either a negotiation of a compact with the state, or they would only be allowed to engage in Class 2 gaming under IGRA, supervised by the NIGC. Okay, and then one more quick question for you. I understand that there's an ex parte young possibility of jurisdiction here against the governor of the tribe, but is the tribe itself waiving sovereign immunity? Is it before us? I don't believe that that issue is before you, Your Honor, and I'm hesitant to waive sovereign immunity when that issue hasn't been briefed. Well, I'm not asking to waive sovereign immunity at the podium. That would be a bit much. So it's safe to say we're here proceeding just against the governor. Is that right? I believe that's right, Your Honor. Thank you. I appreciate it. Can I go to that question, follow up on it? There seems to be a dispute whether this type of bingo by machine is the same as the bingo we know, people in a room calling out numbers. You dispute that. You say it's the same. But assuming that there's, and I do, that there's a genuine dispute on that issue, that still would be subject to federal jurisdiction. A court would then decide below whether this type of slot machine is actually bingo, correct? Well, Your Honor, first, you know, we would obviously dispute that it's a slot machine. But if Texas continued, if this court remands it back down to the trial court for a finding, Texas brought, continued its action under 107C for an injunction, the federal trial court would determine whether or not it was a prohibited gaming activity under section 107A. And I'm trying to be very careful and precise with my words here. Whether or not that's bingo, whether or not that's not bingo, I think that there's a number of factors that would factor into the consideration by the trial court, but that would be under the federal court's jurisdiction. Mr. Martin, can I take you back to Justice Gorsuch's question about IGRA? If you prevail, the tribe is regulated under IGRA. I take it 107C would still separate out Texas from other states, is that correct? To a certain extent, yes, Your Honor. The third sentence of 107C, it has a very interesting construction. It's not – you can't read it as an affirmative grant of an injunctive relief. It says nothing herein shall preclude the state of Texas from bringing an injunction, almost suggesting that if there was a preexisting right from the state of Texas to have that injunction, that they would still have it. I'm not opining on that, but I'm saying that that would still exist, and to the extent that it was read as an affirmative grant or an additional remedy, that the state of Texas would still have that under the Restoration Act. But I guess what I was asking about is that it would still be true that Texas – or is this wrong, that when 107C gives jurisdiction to the federal courts, is that different from the scheme that prevails in IGRA? No, Your Honor. That's the same? Yes, Your Honor. So really it's entirely IGRA. I mean, there's no sense in which Texas comes out worse. We certainly believe there is no sense in which Texas comes out worse, Your Honor. Counsel, just one last question from me, and I'm sure it's not relevant, but like Justice Sotomayor, I'm pretty curious. You all think this thing looks like a slot machine, right? No, Your Honor. I mean, I would actually dispute that. I think the state of Texas thinks it looks like a slot machine, and I certainly – there's been testimony that they think it looks like a slot machine. What would you say it looks like? I would say it looks like an electronic bingo machine that has a bingo card. What makes it look like a bingo machine? Well, there's a – Does it have a name on it that says bingo? Well, there's actually a card, and you can actually switch the cards by pushing a button to change the cards that you're playing. Now, are there reels and lights that would – And are there people calling out numbers and people – somebody saying, you know, B-12? There, in fact, is part of our operations, Your Honor, of my tribe's operations, is live-called bingo, and it's also one of the things that the state of Texas has complained about. But that's something different than the slot machine bingo, right? It is different than the electronic machines, Your Honor, but they've complained about all of it. Okay. Thank you. I'm sorry. Justice Thomas? Just one clarification. Who can operate – under Texas's law, who can conduct a bingo game legally? The Texas Bingo Enabling Act is referencing its specific charitable organizations, Your Honor, that are set forth in that regulatory scheme. So why is this not prohibited if it's not a charitable organization? Because if the games under – not just the Restoration Act, but also under IGRA and under the cases that come out of IGRA, if it's allowed to anyone for any purpose, then it's not a prohibited gaming activity. And that's specifically under IGRA, Your Honor. Justice Breyer? I'm curious about the bingo machines. But suppose that IGRA applied, and suppose that Texas had a law which said you can play bingo up to – one chief game, up to $1,000, but not for more than $1,000. That's a crime. Well, IGRA says it's like the same problem. It says you have to have a – I guess gaming activity on Indian lands is okay if you have a compact or under three, I guess, or something. If the gaming activity is conducted within a state which does not, as a matter of criminal law and public policy, prohibit the gaming activity. All right, so isn't it the same problem? I mean, it says – because they do prohibit it over $1,000, but they don't prohibit it under $1,000. But that you want to call regulation. But IGRA doesn't seem to use the word regulation. Your Honor, it's not the same problem. It's not? It's not. Because IGRA actually incorporates that cabazon-prohibited regulatory distinction. And that distinction is actually critical to the hypothetical. I understand that. So I didn't understand that IGRA incorporated it, but I guess it doesn't incorporate it in the language I just read you. So where does it incorporate it? Your Honor, IGRA would be incorporated – or I'm sorry. Cabazon would be incorporated into IGRA under 27015 and 2710B1A. 2710B1A, okay. And 27015, Your Honor. Yeah, that's what I read you, 27015. Right. It didn't say regulatory. Right. Well – It said prohibited. I think if you read those statutes, our submission would be that that's where IGRA specifically incorporates cabazon-prohibited framework. Justice Alito? Well, I'm puzzled by both your argument and by cabazon, and in particular by how a court is going to decide whether these machines, which I don't have a very clear picture of in my mind, are bingo or not bingo. If they are not bingo, they're something else. Let's say they're dingo. Texas prohibits dingo, then you can't have them, right? If Texas prohibits dingo – Under no circumstances can you have a dingo machine. If it was a criminal prohibition against dingo, you would be correct, Your Honor. Okay. And how do you decide whether this thing is bingo? Would you decide the platonic ideal of bingo? Your Honor, I think that you don't have to decide. No, we don't have to, but somebody does. How is the person who has to decide this going to decide whether this thing – It's not exactly – It's not the kind of bingo, you know, that you expect people to be playing in church or at the Elks. It's something different. How do you decide whether that's bingo? Understood, Your Honor. I think – And let's take the hypothetical that this gets remanded down through to the trial court to make that factual determination. I think that court would take into account a number of things. It would take into account the definition of bingo that Texas has under the Texas Bingo Enabling Act, which actually helps us. It would take into account what IGRA considers to be bingo under 2701 and 2710. It would take into account the expert testimony, much like it did in the contempt hearing below. And I would point out to you, Your Honor, and this is – There are experts who – they are experts on the identification of – you put something before these experts and they can say, that's bingo. No, that's not bingo. There are people who can be qualified as experts on that. The answer to that question is yes, Your Honor, there are. Did you ask my grandmother? My own mother has asked me questions about those very issues, Your Honor. But there are experts, in fact, that talk about whether or not something has a random number generator or not, whether or not the math makes it bingo, whether or not the evidence of the pattern makes it bingo. All of those things are taken into account. All of those same things, Your Honor, are taken into account by the NIGC. The Kickapoo tribe, which is the only other out of the three federally recognized tribes in the state of Texas, one of them gets to engage under the NIGC, under IGRA, and then the two that are controlled by the Restoration Act don't because Ms. Lena One misread the statute and read 107B out of it. And talked about it being a surrogate federal law and that all of Texas' laws and regulations are surrogate federal law. We would submit, Your Honor, you can't read the Restoration Act that way. It's not the proper way to read it. Can I ask you one final question? Because I am – the cabazon ban is more subtle than my mind is able to grasp. Do you think that the sale of opioids without a prescription is prohibited or is it merely regulated? Your Honor, when I would reference cabazon ban for the Restoration Act, I don't have an opinion on your question. I don't want to be very honest with you about that because I want to be responsive. But when you're talking about the Indian gaming context, that is where cabazon lies. That's where this gauntlet is thrown. And that's what Congress was responding to in 1986 when it drafted the Restoration Act. Justice Sotomayor? Justice Kagan? Mr. Martin, I guess just following up on what Justice Alito talked about, this cabazon distinction presents a wealth of sort of complicated and quite frankly weird questions. And the slot machine would just be one of like a thousand of them. I mean cabazon tells us to make a distinction between prohibition and regulation when most of regulation prohibits certain things. And then you're stuck in the middle of trying to figure out what's a prohibition and what's a regulation. But I guess cabazon is there. It's not unique to the question of slot machines. I mean how should we figure in any discomfort about cabazon and the distinction that it makes itself? I guess I would have thought that your answer to Justice Alito was like, welcome to the world of cabazon. Sorry. And that's it. And it wouldn't really depend at all on whether there were experts about slot machines. So that's sort of random thoughts. But I mean this is just the world of cabazon. And how do we take that into account? If I may, Your Honor, I think the distinction here and the difference between the opioid questions or the other questions that you could ask along those same lines, which are fair questions, but the difference is the sovereignty aspect of it. You're talking about sovereign tribes and Congress being the only one that has the plenary power to decide certain aspects of it. If you remember in cabazon, it talked about the fact that Congress made the decision to have the tribes do this in terms of their self-sufficiency. So I think the sovereignty aspect of it shouldn't be and can't be overlooked because that's where 107B comes in. That's where the resolution is answered. The tribe was willing to give up a certain amount of gaming activities in order to not have Texas state law apply directly and not be subject to its regulation. Congress ultimately decided not to accept their offer and to give them less restrictions than they could have in response to cabazon. So I think all of those fit as a piece. And it's also why you could talk about the opioid hypothetical. You could talk about other hypotheticals along those same lines. But this concept of the sovereignty and the tribe's ability to engage in gaming activities, I do think it's a different story. It's not just here's cabazon, live with it. Right. As you put it, Your Honor, and much more succinctly than I have in a month of prepping for this. It's not just that. It's more there are questions of the sovereignty aspects of it and the regulatory aspects of it, the public law 280 aspects of it that I think Congress was answering when it wrote the Restoration Act in response to cabazon. Justice Gorsuch? Thank you, Counsel. Oh, I'm sorry. I didn't have a question. Oh, I'm sorry. No, that's okay. Far away. I'd like to give you a chance, Counsel, to respond to the argument that 105F, I mean, we're talking a lot about cabazon, and 105F essentially imports the cabazon framework itself into the Restoration Act. So if this isn't surrogate law, federal law under the Restoration Act, and we have 105F importing the cabazon framework directly in, why isn't it then redundant to interpret the Restoration Act as you do? 105F certainly incorporates the public law 280 construct, and there's, I don't think, any way to dispute that, nor would we want to. 107A and what it does differently, Your Honor, than what 105F does is it federalizes Texas law as to prohibited games. I think where the Fifth Circuit went wrong in talking about surrogate federal law was it extended it out to laws and regulations of the state of Texas over all gaming activities. That's not what 107 says. So I think that's one of the differences between 105F and 107. The second difference that I would point out to Your Honor is 107C, which sets up a different enforcement mechanism than what would have existed had just 105F been imported and 107 didn't exist. You agree that the Restoration Act establishes Texas law as surrogate federal law. You're saying that it only does that, however, with respect to prohibitions. I'm actually saying it does that with respect to prohibited gaming activities. Right. Things that are prohibited, not those that are regulated. Yes, Your Honor. So the only difference between CAVIZON under Section 280, or Public Law 280, and the Restoration Act is simply this enforcement mechanism? It's the enforcement mechanism, and then it is stating what state laws are federalized for the Restoration Act. Thank you, Counsel. Mr. Yang? Mr. Chief Justice, and may it please the Court, just six months after this Court drew the distinction in CAVIZON under Public Law 280 between gaming activity that is prohibited versus gaming activity that is regulated by state law, Congress enacted Section 107, mirroring that language to draw the same distinction in the exact same Indian gaming context. Section 107A forbids a tribe from engaging in gaming activities that are prohibited under Texas law. And Section 107B further provides that Section 107A does not grant the state civil or criminal regulatory jurisdiction. Texas has conceded in this Court that Section 107B restates the limits of Public Law 280. Those limits draw directly from CAVIZON, they limit state regulatory jurisdiction, and they make clear that Section 107 adopts the CAVIZON framework. The Fifth Circuit's contrary view erroneously relies on legislative history and text that Congress once excluded but then removed from the legislation. This Court should correct that error. Mr. Yang, what's the difference between prohibited and regulated? Something that is prohibited is prohibited outright, and the focus, again— Okay, so a statute or a rule or regulation says all patrons under the age of 21 are prohibited. Right. Is that a regulation or is that a prohibition? That could be a prohibition, but here, not in this context. The statute focuses on gaming activities that are prohibited. The gaming activity would not be prohibited in that context. That is a method of conducting the gaming activity with people under the age of 21. This is exactly the distinction that this Court in CAVIZON drew. And I would point to Williams v. Taylor, which is a unanimous decision of this Court, which said that when a later statute on the same subject matter uses words of a prior Supreme Court opinion, those words are given the same meaning unless there's a specific direction to the contrary. And the word there was failed. Failed can have a lot of different meanings in a lot of different contexts. But let me—I understand. But going back to what you just said, that if the activity is— basically what I'm hearing you say is that if it's permitted in any context, then it's permitted. So the mere fact that bingo is permitted for the churches and the veterans' organizations means it is not prohibited. That's right. And when Congress took up IGRA shortly thereafter, the same Congress adopted the same CAVIZON distinction that is embodied in the provisions you were just discussing with my friend. And it does use the term regulation. It allows Indian tribes to regulate games if the state does not, as a matter of criminal law and public policy, prohibit such gaming activity, again drawing on the prohibitory-regulatory distinction in CAVIZON. And then it operationalizes it in 2710 BND if the state permits such gaming by any person for any purpose. That's the whole standard. It governs the entire United States with respect to activities on tribal lands, except these two tribes under the Fifth Circuit's reading. Mr. Yang, I think your office is going to be very busy over the next 10 years explaining why the word prohibited in 18 U.S.C. whatever still covers activities, possession of whatever, even though it's permitted at some level, right? I mean, it's prohibited to possess a certain amount of whatever, but at a level of personal use or medical whatever, it's okay. Then you can't prohibit it at all. We aren't concerned about that because with respect to this distinction, let me take a step back. This distinction exists in public law 280. It's done so for a long time. CAVIZON was 35 years ago. CAVIZON applied a distinction in Bryan. Bryan understood that there's an important principle at stake here. You need to preserve tribal sovereignty and tribal government, and that if you allow state regulatory power on tribal lands, you would destroy tribal sovereignty. That principle in Bryan was extended in CAVIZON specifically to the gaming context where the court drew this prohibitory-regulatory distinction. We don't think there's a problem with respect to all of 18 U.S.C. because when you're interpreting a statute like this, particularly a statute enacted directly on the heels of a Supreme Court decision on the same subject matter using the same language, what you look to is not some general understanding of the word prohibit. You look to the way that this court has used the term. Mr. Hayes? Just to follow up on the Chief Justice's point, I take your argument that this is a unique context, and we have to read the language in that context. But Texas argues even in this context, the difference between prohibition and regulation is just unworkable. It's almost an argument perhaps for overruling CAVIZON. I'd like your thoughts about whether this distinction remains workable in this context. Forget about the others. We think it works in this context because it is working under IGRA. This is exactly what goes on under IGRA. If the court were to agree with our submission and that of the tribe, then the NIGC would get to determine whether this is a bingo activity, and in addition, whether it is class 2 bingo or potentially class 3 bingo, which would require a compact with the state. And what would be the negative consequences in the government's view, if any, if we were to allow this distinction, ignore it, overrule CAVIZON? Wow. First of all, I don't think that's before the court. This has been a fundamental distinction that's existed in the law of tribal sovereignty and tribal lands for decades upon decades. Again, it goes back before CAVIZON. So that's the public law 280 context. I'm not sure what the court would do if it was just limited to this specific context because Congress has already spoken in IGRA. IGRA exactly parallels this distinction. It's beyond the stage of rethinking now CAVIZON. CAVIZON is embedded in the law in all kinds of areas. Are there problems under IGRA or public law 280 in drawing the lines that we've been pressing between prohibit and regulate? You know, there may be some close cases, but in the minority of cases we've not seen a huge wellspring of problems. Again, this has existed since Bryan and since CAVIZON 35 years ago. And again, IGRA has existed for a long time. But if we were to— Correctly, I just want to—please go ahead. I just wanted to follow up real quick. So in the government's view, if we were to eliminate the distinction between regulate and prohibit in the Restoration Act, we would also wind up inevitably doing so in IGRA and that that would have more negative consequences than positive ones. Is that summarizing your view? I'm not sure how the court—I mean, there's statutory text in IGRA. I'm not sure what the court's decision would mean for IGRA. It certainly would mean a huge change in the law in terms of governing public law 280, which is one of the fundamental statutes governing Indian lands. So I would caution the court not to be overly ambitious here. This case does not involve a question of rethinking CAVIZON. The ultimate question presented is whether Congress in enacting the Restoration Act was adopting the CAVIZON framework or instead was applying all of Texas law governing Game Act. Thank you. I'm sorry, Justice Breyer. The reason that this is not a problem, when it comes up, it's normally a question of where or when or under what circumstances can you play this game. But it's not normally a question of how do you play it, because if it were how do you play it, you would have trouble saying, you know, is it bingo or is it, you know, craps or something. But it's the first three, which are usually fairly easy to decide. Am I right or wrong? No, actually, I think there is the question of whether things do constitute bingo, and it arises not infrequently in the context of IGRA. You know, this is not in the QP in terms of is this bingo, and we've not briefed it. And so I can give you a thumbnail sketch, but it would be difficult, I think, to give you the whole lay of the land here. I'd love to hear what the difference between bingo and dingo is. Well, I've not heard of dingo, but I can tell you that bingo has three primary characteristics. These are actually codified in IGRA. Congress has recognized that these are the three primary characteristics. One, you have a card bearing numbers or designators. Two, you cover those numbers when they are drawn or somehow identified, and you win by covering an arrangement of numbers. This is in 27037AI. This is a kind of an understanding of what bingo is, and you would ask, is this bingo? Or is it a method of conducting bingo when you use a computer? Even Texas, by the way, allows card mining devices, which are these devices where you can, instead of tracking five cards, you can track 66 cards under state law at one time. The problem that the district court found was not that this wasn't bingo. It was that Texas law requires that you not submit, put the money in the device, or get paid out by the device. That was the problem under Texas law. There's a legitimate question whether this would be a Class II or Class III bingo under IGRA, but, you know, that's not presented here. Mr. Yang, can I ask, to follow up on Justice Gorsuch's and Justice Barrett's questions, assume we don't overrule Kavazan, but if we were to rule for the state of Texas in this case on this statute, would there be any follow-on implications for other statutes, or is it possible to rule for the state of Texas narrowly in this case without such follow-on implications in your view? You know, I think it would depend on how the court wrote the opinion. This is a Texas-specific statute, so it might be possible. But I would, you know, so there are some questions that I'd like to still address. One was about the meaning of 107B. I think 107B has to be read in conjunction with 105F. 105F is a grant of civil and criminal jurisdiction to the state under Public Law 280. When they use jurisdiction there, Justice Kagan, it's not with respect to courts. It's with respect to authority, and the use of that term is generally used, you know, post Arbaugh, we're trying to get away from using jurisdiction when we don't mean court jurisdiction, but this is before Arbaugh, and it's quite common both in legislation and in the court's decisions. Then if you look at 107B, it uses that same phrase, civil and criminal jurisdiction, but inserts regulatory, and that was the exact distinction that Kavazan drew. Remember, Kavazan was already writing on top of Bryan, which said there's no civil regulatory jurisdiction, and it said just because you add a criminal sanction doesn't convert it to a criminal law that you can enforce under Public Law 280. So 107B directly draws on that same Kavazan distinction, and it says nothing in Section 107 shall be interpreted to grant that authority, which means 107A, when it says gaming activity is prohibited by state law, does not grant regulatory authority, and that is the second half of the Kavazan framework. Prohibited, not regulated. I think also, you know, IGRA is worth considering here, because Congress enacted IGRA, same Congress, and as Justice Scalia explained in Branch v. Smith, when you have a similar statute on the same body of law, you can look at that to clarify the meaning of another statute because it's within the same body of law. You read it in pari materia, and I don't think there's really any dispute that by using the same regulated and prohibit language and the provisions that we've talked about, which are at page 9 of our brief, that Congress in IGRA was adopting Kavazan. Congress is doing the same thing here, and there's no reason to distinctly disadvantage these tribes where Congress uses the same language and establishes... But Mr. Yang, doesn't that answer Justice Kavanaugh's question? If we were to ignore Kavazan here in 107, on what basis could you continue to recognize that distinction under IGRA? Wouldn't that be pretty hard? You know, it's a different statute. Is that the best you've got? I think it would be difficult to draw that distinction. It really would. These are same context in this, you know, same Indian gaming context written by the same Congress in the same general legal world post-Kavazan. I think it's hard. You know, our view is you should read public law to section 107 the same way that you read IGRA. And I'd like to talk about the tribal representation. Can I just ask one follow-up to Justice Gorsuch's question? But, I mean, the common thread in all of these is Kavazan. So without Kavazan, it sounds like you're taking a slightly different position than your friend. It sounds to me like you're saying Kavazan drives this. Without Kavazan, if we're talking about just the ordinary meaning, then it's a lot harder to make the case for this distinction. Oh, it's much harder to make the case. You know, you could make the case. It would be a much higher hurdle to cross. But I take your view to be saying Kavazan is all over this statute. In other words, it's not just saying, oh, look, prohibit. Six months ago, Kavazan said something about prohibit. But you're making the case that if you just look at this entire statute, Kavazan is pretty much all over it. And Kavazan was always in this, well, once it existed. Section 105F has always existed in every piece of legislation going back to 1984. 105F existed. Congress knew when it was adopting 105F, which would then incorporate the public law 280 framework, that that comes with Kavazan. And then with respect specifically to gaming, it's the specific provision rather than the general provision of 105F. It, again, uses Kavazan's language five minutes later. I'd like to talk about the tribal resolution. I'll give you a minute. Okay. So the tribal resolution, you know, in 107A, Congress's reference there respects the tribe's strong opposition to the direct application of state law. And the text, you know, there's been debate about the resolution. The text of the statute cannot be read as applying the final request in the resolution because no one thinks, and the text does not allow you to read 107A to prohibit all gaming prohibited under Texas law. It's just not what happened. There was also a significant textual change when Congress first adopted the reference to the tribal resolution. It said pursuant to the tribal resolution. This is on page four of our brief. All gaming is prohibited as defined under Texas law. Kavazan came. Congress retooled 107, and then it said, instead of said pursuant to the resolution, it said this is enacted in accordance with the resolution. We think that gives us some more flexibility, and what it really reflects primarily is the tribe's strong opposition to the direct application of state law. That's why section 107 is federal law, and that's why federal enforcement generally prevails with the exception of state enforcement if the state has a preexisting cause of action that it can insert for an injunction against the tribal office. Thank you. Justice Thomas, Justice Breyer, anything further? Justice Alito? Didn't the tribal resolution ask that the statute include, quote, language which would provide that all gaming, gambling, lottery, or bingo as defined by the laws and administrative regulations of the state of Texas shall be prohibited on the tribe's reservation or on tribal land? Didn't it say that? It did, and Congress in response adopted verbatim that language. This is on page four of our brief. That was in 1986, and then when H.R. 318 was introduced in 1987, again on page four of our brief, that exact language was in the bill. But that is referenced in 107A, is it not? Which is? The language I just read. 107A does not have that language. It says that 107A is enacted in accordance with the tribal resolution. Yeah, okay. But the tribal resolution had many things in it, and this is it. All right, I understand. I understand your point. One other question. You refer to the Indian canon. Those who favor the interpretation of statutes to mean what the words of the statute are generally understood to mean have some question about some of these substantive canons. Now, some of them, like the rule of lenity, have a long history. What do you think is the basis for this Indian canon? Well, it has a long history in this court's jurisprudence, and I think it recognizes a special role in our relationship historically with Indian tribes. I don't think you actually need the Indian canon. We didn't make a big deal out of it in our brief. It's certainly part of the court's jurisprudence that if you find this ambiguous, that you should tip the scale. But we think this is a pretty clear-cut case of Congress six months after Cabazon adopting the language of Cabazon to apply Cabazon's distinction in the same gaming context. That doesn't really answer my question. What is the origin of this? Is it your argument that throughout history, Congress has always framed statutes in a way that are favorable to Indian tribes? My research for this case, unfortunately, has not gone that far back. I don't have the original... No one has challenged the Indian canon's existence here, and we've not gone back to form an argument for it, Your Honor. Justice Sotomayor? Counsel, the 1986 tribal resolution, in my mind, seems to serve a variety of different functions. The first, I think, is that you need Indian approval to have any state law apply on a reservation, correct? Yeah, I think that's part... Generally true. Yes, but significantly, the tribe didn't want the state to impose its laws directly on the tribe. Exactly. That was a very significant issue. So that's where 107C is in accordance with the resolution, because they didn't want the state to be able to regulate or have its laws apply directly. I agree with that, but I also think 107A is, because 107A applies as federal law a limited set of state laws that prohibit. And what that does is significant. It makes a federal criminal offense to conduct unprohibited gaming activities. If we read this the way the state wants, presume that they are running a bingo game exactly the way the churches do, okay? Is it your view that then the federal court would be open to seeing whether or not they have all the signs that are required by the state, whether they have... Yeah, that's exactly how things have played out since the Declarative One. And as the district court is... You know, we cite these cases in our brief. This has not been a good way of providing a regulatory framework through injunctive actions in federal courts where federal court has to talk about, you know, how many cards can you play and what hours can you play and what's... That's not what Congress would have intended, we think. Congress would have intended to put a pretty high bar of prohibition, and then when it enacted IGRA, it goes straight to the NIGC. And the NIGC, the expert agency, gets to decide... I guess Texas would say, we only permit not-for-profits to play. This is not for profit, so they shouldn't be playing at all. Isn't that their argument? That's, I think, part of their argument, and I would say that Cabazon directly addressed that. Cabazon was a provision in California law that only allowed charities to operate bingos and that set a limit of $250. And the court said, you know what? That is regulating bingo. It is not prohibiting bingo. Thank you, counsel. Justice Kagan? I'm about to take you outside the scope of this case, so I apologize beforehand. But Justice Alito raised what, to me, is an interesting question that I've been thinking about a good deal about what these substantive canons of interpretation are and when they exist and when they don't exist. They're all over the place, of course. It's not just the Indian canon. Next week, we're going to be thinking about this supposed major questions canon. There are other canons. I mean, if you go through Justice Scalia's book, you'll find a wealth of canons of this kind, these sort of substantive canons. Some of them help the government. Some of them hurt the government. Is there any way that the government has of coming in and saying, like, how do we reconcile our views of all these different kinds of canons? Maybe we should just toss them all out, you know? I mean, I think kind of we should, honestly. Like, what are we doing here? But is there, do you have a view of, like, when these canons are the kind that you're going to talk about in your briefs and when these canons are not the kind that you're going to talk about in your briefs? Well, I think our briefs generally grapple first with the text, right, as we've done here. And canons, I think, can play an important role in certain contexts. I think, for instance, Bryan recognized that in the Indian tribal sovereignty context, there is a very important principle that kind of underlays the body of the law there. You do not want to read statutes to grant state regulatory authority on tribal lands without kind of a clear expression of that. And I think that those types of principles reflect a background body of law that one brings when reading statutes. So it's true, you know, I think I've seen in courts decisions that, you know, sometimes you get canons that conflict, right? They run in contrary directions. These are aids in interpretation, but we always start with the text. Justice Gorsuch? The government doesn't waive sovereign immunity lightly. That's one of our canons, right? That's exactly right. And isn't the Indian canon very similar in its function in saying that we don't lightly assume that Congress has allowed state authorities to regulate an independent sovereign? I think it's similar. There are different underlying principles behind them, but I think there is a similar spirit to that thought. Justice Kavanaugh? Just to follow up on Justice Kagan's question, because I think that's important, and Justice Alito's as well, on the Indian canon, I just want to isolate what kind of canon it is, because it seems like our substantive canons fall into two buckets. One bucket are ambiguity-dependent canons, if a statute's ambiguous, do this. Another bucket of canons are plain statement canons for mens rea, extraterritoriality, and the like. The former category, the ambiguity-dependent, like our deference rule of lenity. I want to confirm that you think the Indian canon is an ambiguity-dependent canon as it's been traditionally applied. I think that's generally true, but there's something else going on here too, which is the principle that Brian recognized, that in this specific context, when you're talking about the application of state regulatory authority on Indian lands, you need to be more cautious. Now, admittedly, this is a federal statute that applies federal law, but I think some of the caution that Brian reflects I think should guide the court. So that suggests you need more of a clear statement, and those clear statement rules usually reflect some constitutional or quasi-constitutional value, due process, extraterritorial structure of the country. What would that reflect here, that principle you just described? Well, I think it reflects that Indian tribes are sovereign nations, that they have before the founding of this country. And the court's opinion in Bay Mills tracks some of this. So whatever you think about the canons in general and whether that should be a plain statement, just tip the balance in ambiguity, the Indian canon, at least when we're talking about tribal sovereignty and the application of state law on tribal lands, that does have a strong pedigree, and I think ultimately it traces to the fact these are sovereign nations. Thank you. Justice Barrett? I want to follow up on this canon line of questioning. I'm sorry, I know you said that you weren't thinking about the canons when you came in here today. It was actually my understanding, and Justice Kavanaugh pointed out, that our substantive canons fall into these clear statement and ambiguity buckets. It was my understanding that the Indian canon was in the ambiguity bucket. Oh, that is generally true, and that's the way that we used it in our brief. But in this case, because of Cabazon, Cabazon was built on Bryan. Bryan applied a stronger version of the, it's actually kind of a brother doctrine, I guess, or a sister doctrine. Was its debut in Bryan? No, no, this goes back quite a long way. This goes to infringements on tribal sovereignty and the recognition that it's generally only the United States that governs dependent sovereigns like tribes. So it's like a sub-Indian canon canon? I'm not sure that I'm prepared to put a proper label on it, but I can say that it exists in Bryan, which came through Cabazon, and Bryan itself was, this is cited actually on pages 16 to 17 of our brief. We discussed Bryan and some of the principles underlying Bryan. Okay, thank you. Thank you, Counsel. Thank you. Ms. Pettit. Thank you, Mr. Chief Justice, and may it please the Court. In the 1980s, everybody in this case wanted something. The tribe wanted federal recognition and was willing to cede some of its sovereignty. Texas wanted to avoid high-stakes gambling, which it saw as an invitation to organized crime and was willing to cede some of its jurisdiction. The federal government was split about how to balance these sovereign interests. So everyone made concessions, which are embodied in the Restoration Act. The tribe got its recognition and may offer gambling to the same extent as other Texans, but further gambling is banned under federal law. The tribe asked to rewrite this legislative bargain based on Cabazon Banned, but it submitted that Cabazon Banned did not address how to interpret a statute that federalizes state law. Its effort to extend Cabazon Banned suffers from three primary faults. First, it ignores that when it comes to gambling, the Restoration Act departs from the Cabazon Banned framework by treating both civil and criminal penalties and civil and criminal regulatory jurisdiction the same way. Second, it overlooks that the Cabazon Banned test was written to avoid a form of state encroachment into tribal affairs that isn't possible when a federal court is applying federal law. And third, it depends on a definition of jurisdiction that disregards the close tie between that term in the 1980s and an adjudicator's ability to decide a case. That's how it's used in Public Law 280, in Section 105F, and as Justice Kagan noted, in Section 107C. Applying that same definition to 107B, regulatory jurisdiction encompasses a state administrative agency's ability to exercise oversight through, among other things, reporting requirements, inspections, and ultimately enforcement actions, not the state's larger ability to set substantive limits on gambling. I welcome this Court's questions. Counselor, could you give me an example of a regulatory law or rule that applies, a gaming, regulation of gaming laws that applies to tribes that do not fall under 107A? I'm not... I'm sorry, that would be covered, would not count as a prohibition under 107A. To the extent... So 107, the prohibition, as it's generally understood, means it's unlawful. There is a regulation that would apply to somebody who's not the tribe that wouldn't be a prohibition. Would, for example, be that the Texas Lottery Commission can typically get access to passwords so that they can have an ongoing oversight into the way that software functions. That's a regulation that wouldn't apply to the tribes because it's not a prohibition relating to gaming activity. Now, there's been some discussion as to the difference between prohibition and regulation. Would you comment on that? I mean, you've heard all the arguments. So prohibition in this context, as generally understood, can include a regulation except for, as Justice Barrett noted a couple of times, cabazon bans. So the regulation distinction made in cabazon ban was specific to Public Law 280, which was trying to decide the difference between criminal and civil laws, which is a question not presented by the Restoration Act. So there seems to be, by counsel, a suggestion that the mere fact that any group could participate in bingos, for example, the veterans organization or the churches, that even if it's outlawed as to other organizations or for profit, that that is not a prohibition. Under their view, that's my understanding. But it's still a prohibition under Texas law because it goes to a fundamental problem with the public policy shorthand for the criminal-civil jurisdiction distinction that cabazon ban was trying to make because, as Justice Alito pointed out, a prohibition is still a matter of public policy, even if it includes exceptions when the activity is not prohibited. I'm sorry, counsel. Could you explain that more clearly to me? Just earlier you said to Justice Thomas that a regulation that wouldn't apply to the Indians would be one that required their passwords to play the game, correct? Yes, Your Honor. And I assume that's because you recognize that the prohibition is on playing bingo, not on how you play bingo, correct? On the gaming activity, yes, Your Honor. All right. So how is that different than what you just said? So a financial requirement, a password requirement, I don't know how you can read that into gaming activities which are prohibited by. Because bingo is not prohibited by. What does it matter whether it's a not-for-profit or not? So the bingo outside of the limited affirmative jurisdiction, sorry, the offense to prosecution is what the Bingo Enabling Act is. So any bingo that is not conducted pursuant to the Bingo Enabling Act is prohibited as a matter of Texas criminal law. You can't play bingo unless you give the password. No, Your Honor. You can't play bingo unless you meet certain financial requirements. You can't play bingo because you're not a not-for-profit. No, Your Honor. I don't know where I draw those lines. So the password example that I gave was a regulation applicable in the larger bingo regulatory framework of Texas law that does not apply to the tribe because it doesn't go to the gaming activity. The gaming activity could, to take the Chief Justice's example, be a distinction between low-stakes bingo under $100 or the distinction in Texas over $750. The state's regulatory interest or the state's prohibitory interest, however you want to frame it, is different between low-stakes and high-stakes gambling. So the use of the term law is another focus under 107A, and both the tribe and the United States focused on an earlier version of the bill that ultimately became the statute that included the terms laws and regulations. But under this court's precedent, the term laws typically includes regulations, so you can't really interpret anything by the deletion of redundant language in a draft bill. Counsel, what about the other laws that were passed contemporaneously with this one for other tribes that use broader language like prohibit or regulate? Why shouldn't we look at the contrast between this more precise or narrow language in those? By looking at the context of each of the statutes. Each of the statutes they cite is a settlement act that is enabling a preexisting agreement between the parties to litigation. So the language that Your Honor is citing is maybe the language that the parties determined was necessary, but it doesn't give much of an indication, if any, about what Congress would have determined was necessary if it was on its own. And this also goes to the larger context of the Restoration Act, because the term prohibit and the term regulate were in the Restoration Act before Cabazon banned. After Cabazon banned, in the Senate there were two distinct changes to both 107A and 107B that show a departure from Cabazon banned, which expressly linked the concept of civil and regulatory and criminal and prohibitory. That is, the insertion of civil and criminal penalties in respect to prohibitions in 107A and the insertion of and criminal into a preexisting statute that said civil regulatory jurisdiction. So if I take it the difference is you think the words prohibited by the laws refers to all the prohibitions by the criminal laws. And they think it refers to the distinction between regulatory and prohibiting it outright. OK. And the key here is are they referring to Cabazon as they think or are they thinking back to the resolution where they said we don't even want taxes? That's the big difference. And everybody's looking at different other statutes which may or may not cast some light. OK, I think I know the answer. But look, I'm in an odd position. I'm like the light brigade. I have cannons to the left of me and cannons to the right of me. And I'm going into the valley of death, charge the 400. But, I mean, there used to be ways of finding these things out. You went and you read the report of the Senate committee or the House committee or the conference committee. And you read the testimony before the committees. And you read what the Justice Department told them or the Department of the Interior. And you read what other people said on the floor, perhaps. And sometimes, but not always, that, in fact, shed some light on the proper answer. So my question is if, pursuing my odd single path, perhaps, I did that here, would I find anything? You would find the Senate report, which is the only report that deals with the final version of the statute. And the Senate report said that the addition of civil and criminal penalties, what I just mentioned, was designed to build upon what the House had originally amended to, say, just prohibit, to make clear that civil penalties were also applicable, which we especially suggest supports our cause. Well, I pressed your friend, Mr. Martin, a little bit on the tribal resolution, which I think is very strong evidence for you. On the other hand, his answer that, well, that wasn't addressed in the final bill, it was a predecessor bill, also seemed pretty good. Do you have an answer to that? Your Honor, the resolution may have been passed in response to a prior bill, but it is incorporated into the text, or it's at least referenced in the text, of the actual bill that was passed and became law. So that has to be given some meaning. And the fact that it was aimed at a different bill is not dispositive one way or the other. Ms. Pettit, if, you know, this just said prohibit, and we were in a world where we didn't have any context on the page or otherwise, I think you would win. The question is, do we have so much context about prohibit being used in a specialized way that you lose? And I guess I would just point you to a few things and ask you to address them one by one. So the first is 105F, which I take it you acknowledge incorporates Public Law 280, and Public Law 280 had just been interpreted in Cabazon as having this prohibitory regulatory distinction. Yes, Your Honor. The second is 107B, which specifically talks about criminal regulatory jurisdiction. Now, there's a question as to what kind of jurisdiction it's talking about here, because jurisdiction is used in two different senses in this statute. But I think that Mr. Yang has an awfully good argument that when they're talking about regulatory jurisdiction, they're not talking about it in the which court sense. They're talking about it in the Cabazon sense. So it says, you know, we don't want to give the state regulatory jurisdiction, meaning the state doesn't have any regulatory power here. Then the third thing would be what Justice Barrett said. I think you've responded to that. The other statutes passed around the same time, actually on the same day, right, that clearly understand the Cabazon prohibitory regulatory distinction. So you take all of those together, and this is what I meant when I said to Mr. Yang, Cabazon is like written all over this statute. It's not just like we have a world in which we say, oh, did they know about Cabazon? Would that have affected what they were doing? I mean, Cabazon is in this statute in multiple places. So why isn't it in this statute in a way that defeats your claim here? So in Cabazon, this court used the phrase regulatory authority, not regulatory jurisdiction. When referring to the power to set laws, this court has typically used the term legislative jurisdiction, which is tellingly not the word that Congress has selected. Moreover, and I would point, he made a comment post-Arbaugh that we try to be more careful about jurisdiction. I think that in the 1980s, there was a very clear tie between jurisdiction and an adjudicative officer, not necessarily a court, and I would point you to the fifth edition of Black's Law Dictionary, which was published in about 1983, which specifically discusses jurisdiction in those terms. So it may not be a court-specific term, but absent the phrase legislative jurisdiction, it does tend to have an adjudicative meaning. So that is where, and it's used consistently in 105F, which you're on a reference in that sense, and it's used in 107C in that sense, and so it would make sense to use 107B in that sense to avoid the charge of the light brigade with various canons. So in reading it in the larger context of how that term was used in the 80s, as opposed to, for example, in the mid-2000s after this court's case, City of Arlington against FCC, where you equated authority and jurisdiction, helps to clarify any ambiguity. That's all I have, and I'm happy to answer any questions. Given Capizone, sorry to interrupt, given Capizone, why wouldn't it have been obvious to members of Congress to say something like the following if you wanted to do this, like all Texas law regulating gaming activities applied to gaming activities on the reservation and lands of the tribe? In other words, boy, there's this case. We better be careful, and we're in the world where we're assuming Congress is responding to the case. So why wouldn't the people who wanted this broader authority to extend have been, we need to be careful about this, and doesn't the absence of that suggest something that hurts your case here? Two responses. First, I heard a lot from both the United States and from the tribe that said that Capizone Ban was especially informative because of the context. The Capizone Ban addressed may have the facts of Capizone Ban, may have been relating to gambling, but it addressed a statute that applied across the board equally to taxes and to regulation of pharmaceuticals or a number of the other hypotheticals we've had today. So why Congress would have necessarily said, well, Capizone Ban defines exactly what term we have for gambling, it's not nearly as close as that. And I believe Justice Alito asked a few minutes ago how you determine whether you are going to apply a canon about assuming Congress, or it might have been Justice Hagin, I apologize, about when you assume Congress was understanding the particular context. Normally this court does that when you have a well-established term that's been used a number of times, whereas here you have just the term prohibit, which is a commonly used statutory term. It's been interpreted once in a case that respectfully is not the most precise case this court has ever issued, and so assuming that Congress intended to enact and make perennial for all tribes for all uses of prohibit based on this one case would be taking that canon too far. And the best way I think I can point this to is differences between the language of IDGRA, which, for example, does track Capizone Ban in that it says, prohibits as a matter of criminal law or public policy in 27015. That's not the phrase that we have in the Restoration Act. That is what we have simply is the use of the common term prohibit. You see that again in 2710 when you're talking about when Congress is talking about when the state can or the tribe can engage in activity, which is whether the state permits it for any purpose, for any person, entity, or organization. Again, that tracks the Capizone Ban prohibition language much more closely than here, where we just have that term prohibit. Wasn't it obvious or wouldn't it have been obvious that what happens when a state allows an activity but regulates it heavily, can those regulations apply to the tribes? Wasn't that an obvious question? Wouldn't that have been addressed in a different way, I guess, again, if we're in this world where we're trying to speculate what Congress was thinking? This is why it's always dangerous to speculate what Congress was thinking. Yeah, that's a good answer. But the term laws typically does include regulations unless Congress specifies otherwise, which it didn't do here. And this goes back to a number of the questions we've had today about the signage that is at casinos and whether that would apply to the tribe. And it doesn't because it doesn't go to the gaming activity, as this court defined that in Bay Mills, where it was the, I think the words of the court were the throw of the dice or the turn of the wheel, the actual game that's being played and not the off-site administrative or regulatory body. Why would it make sense? Here in 107C, the federal court is given jurisdiction if the state wants to bring an action for an injunction to stop, in your view, regulatory violations on the gaming activity. Why would it make sense to enlist federal district courts to police all these aspects of gaming? It just seems to me like that would be an odd system. So we are only entitled to bring an injunctive action for violations of the substantive limitations on gambling, not the regulations that don't go to the gaming activities. But it does make sense because, as the United States pointed out, the tribe was very against the direct application of state laws in state courts, which was the issue in Cabazon Band. So there isn't the direct application of state law here. There's this third party, a federal judge, that is a neutral, might be a loaded term for this context, but I'll use it anyway, a neutral arbiter to apply this issue rather than having to, for example, go into the state's home court. Let me clarify. I think I misspoke. I didn't mean, I mean, I know that you concede that you don't have regulatory jurisdiction in the sense of an agency oversight and all these other aspects. But I'm talking about the disputed number of things. Once bingo is allowed, is it, you know, allowed by noncharitable organizations? Is it allowed for profit? Is it allowed above this amount? Those kinds of things. I mean, the district courts in Texas have complained about all of these things heading to the district court. So the district courts have said that a version of the previous injunction issued in 2002 had turned them into a sort of preclearance type of regime that hadn't been contemplated by the Restoration Act. We agree that wasn't contemplated by the Restoration Act, but it was necessitated by the tribe's actions who had not attempted to comply with the Restoration Act. But fortunately, we're no longer in that regime. We have brought a separate complaint, and most of the issues that are covered in the current injunction before the court are statutory ones, not regulations. Right, but your position requires you to accept the idea that, for example, if Texas has a statute that says bingo has to end at 1 a.m. and instead it goes to 1 10, that all of a sudden that's a federal crime adjudicable in federal court. I mean, that's your position. The other side's position is essentially no. The federal courts are there when Texas has a statute that says no table games, and all of a sudden a casino opens up with craps. But your position is like everything. The amount of the betting, the hours, I mean, everything that relates to the turn of the wheel or whatever, and that's a lot of stuff. But it does create a bright line rule, Your Honor, which gets the federal court out of the second question that would be necessitated by applying cabazon band, namely whether one particular restriction or another is a matter of fundamental state public policy. And there are law and order concerns that sometimes drive issues like closing down gambling halls at midnight or limiting the amount of money that is at stake because there is a different regulatory and a different public policy and a different just risk involved in some forms of gaming. Counselor, you argue at some length that the cabazon distinction between prohibition and regulation is unworkable. Are you asking us to overturn cabazon? No, Your Honor. That's not necessary in this case because, as my opposing counsel has conceded, this is about federalizing state law, and cabazon doesn't specifically decline to address that question. That's not quite what I'm getting at. You say the distinction between prohibition and regulation is generally is not workable. Yes, Your Honor. Wouldn't that logic seem to suggest if that's true, then cabazon, we should just get rid of it and scrap it and the consequences for IGRA be damned? So the consequences for IGRA, I respectfully disagree with the United States, would not be significant because IGRA incorporated the pieces of cabazon band that were necessary in the language that I previously quoted, but the court doesn't need to overturn the cabazon band distinction for the circumstances to which it applies. So you're not asking us to overturn cabazon, and you're asking us to continue to apply that in the IGRA context? I'm asking you to continue to apply IGRA in the IGRA context, which incorporates cabazon. Pieces of cabazon, but not necessarily. Okay, this is the one area where we're not going to apply cabazon. That's your view? Yes, because the language of the statute itself departs from cabazon band and in response to Justice Kavanaugh's And that hinges on whether we agree with your reading of the statute and the enactment on the same day involving the tribe in Massachusetts, right? It definitely depends on your agreement that by slicing and dicing up civil and criminal regulatory and prohibitory that Congress intended to depart from cabazon band, yes. But Ms. Pettit, why is it uniquely unworkable in this context? Mr. Yang said, look, this has been humming along, everybody's been living with cabazon band and this distinction between prohibit and regulate in public law 280 and in IGRA. So why is it so uniquely unworkable in this context? So the lower courts have suggested that Mr. Yang is incorrect on that point, that in fact it's difficult to derive a single rule between what is prohibitory and what is regulatory precisely because many of the things that are nominally prohibitory are very close concerns of the state public policy so they just don't track. Well, isn't that an argument for returning it in IGRA too and just getting rid of it? So IGRA incorporated a specific part of cabazon band that allows the tribe in 2710 to engage in class 2 gaming which permits them to, the state permits it under any person, any purpose, any organization. So that is a different term than prohibitory or regulatory. I understand that, but you're saying it doesn't work well under IGRA. You're disputing Mr. Yang on that. But you're saying this is somehow unique and I guess I'm struggling, like my colleague, to understand how it's uniquely problematic here but less problematic, I guess, under IGRA. Maybe I misspoke earlier. IGRA, the public law 280 prohibitory regulatory distinction itself is problematic outside of IGRA because it doesn't have that any purpose, any person, any language. That creates a bright line rule. Whereas this court recognized in cabazon band itself that the distinction based on what is or is not a matter of fundamental state public policy does not create a bright line rule. So just back to Justice Barrett's question, does it work well under IGRA or not? Texas doesn't have that much experience under IGRA, so I'm not able to answer that question. It has some experience. It has the Kickapoo tribe that's operating under class 2 gaming pursuant to IGRA. So right now what you have is one tribe under IGRA, another tribe completely out of IGRA, and even worse you're saying it wasn't even intended to be run like the regulatory prohibition line that cabazon approved, correct? Correct. So you want a system that's unique to everything, to cabazon, to Brian, to every other tribe, and you want to create a totally different system now. Congress created a bespoke legislative solution here. That's assuming we accept your argument. Yes, Your Honor. But that was Congress's intent. Yes, Your Honor. My response earlier was that we do not regulate the Kickapoo, so we do not have much insight into what they're doing inside their casino, so it's very difficult for me to say whether it's been a problem. Well, anybody can walk in and play. Yes, Your Honor. So you can see what they're doing, what it's violating, if you chose. I suspect the tribe would object if we were to send a peace officer in without permission. You could send a peace officer. Anybody can walk in. You could send a peace officer. A state employee could go in without authority and examine it in their personal capacity, but that's not typically how laws are enforced. Thank you, Counsel. Counsel, Justice Thomas? Justice Breyer? Maybe further? Justice Alito? Suppose you scrapped your laws about bingo and you enacted a statute that says that under specified circumstances, a type of gambling called Texas traditional board game is allowed, and you defined that involving a board, et cetera, et cetera. Now, this is not bingo. This is the traditional Texas board game. Then would bingo be prohibited or would it be regulated? If we scrapped the Texas Bingo Enabling Act, it would fall within the constitutional prohibitions on lottery and it would be prohibited. It's still prohibited outside the Bingo Enabling Act, but it would be flatly prohibited under state law. So this all turns on the fact that you've used the term bingo and that there is the form of bingo up there, and so the next court is going to decide whether this is bingo or not? No, Your Honor. This depends on the word bingo is not the relevant question here, and it may be useful to answer your question to distinguish this from the facts in California and since NCAB is unbanned where they generally permitted gambling except that which we prohibited. Texas has the exact opposite presumption. We have a strong public policy and all gambling is banned under the Constitution unless specifically authorized. The Bingo Enabling Act specifically authorizes small stakes bingo under very limited circumstances as a defense to prosecution, but if we were to scrap that Bingo Enabling Act, the conduct of the tribe in this instance would fall within the state's constitutional ban on lotteries. Justice Sotomayor, any further? Justice Gorsuch? Justice Barrett? I have one question. If you lost and we vacated and remanded, and so then the district court has to face the question of whether these electronic bingo games count as bingo, you just revert to the Texas definition, and I gather it's Texas' position that these electronic machines would not count as bingo? Yes, Your Honor, because they are slot machines. They do not have the competitive aspect of bingo because what, I believe somebody referred to their grandmother earlier, that is you are matching numbers and the first person to reach a particular pattern wins. And here you have one card and it is an instant game that is drawn against a historic bingo draw, and that's just not bingo. And you'd make that argument based on Texas law? Under the Restoration Act, we would. It's the same issue under IGRA, which is why the United States was very careful to say that the question of whether or not this is actually bingo under IGRA is a very close one.  Thank you, counsel. Mr. Martin, rebuttal? Mr. Chief Justice, if it may please the Court, four quick points. First of all, in response to a question from the bench, I think that the justices, you certainly understand the distinction and the difficulty that the state of Texas has with making the distinction as to where the regulatory line starts and where the regulatory line stops. If they wanted the passwords, they had to get the passwords. When is that not regulation and when is it? If they can, in fact, regulate. And the problem is that their position requires them to take the position that the entirety of the regulatory construct of Texas law, and this is the same thing the Fifth Circuit said in its letter one, is that the entirety of the regulatory construct applies to the tribes. That's not what 107B says. And in response to some of the jurisdictional questions, Section 105F grants civil and criminal jurisdiction to grant the public law to any authority. Jurisdiction there means the substance of authority. It's not limited to court jurisdiction. Section 107B's use of the jurisdiction is the same. Section 107C is different, and it specifically says jurisdiction over enforcement. And there's one other aspect of what the state of Texas has argued just now in this case that I think deserves to be said. There's been a lot of discussion about whether or not cabazon applies. Are we stuck in the cabazon context, et cetera? Two things I would point out. Justice Breyer, I would point out that Representative Udall, who is the chairman of the applicable subcommittee, stated on the House floor this is intended to incorporate cabazon. That's important. The Senate report that was cited by the state of Texas references the old language that Congress excised, and that should be taken into account. Finally, Your Honor, I would point out I can't remember exactly how the state of Texas just put it, but they were talking about Section 107, and they said that it applies to everything, not just gaming. Section 107 is entitled Indian gaming. It is intended to govern that exact situation in response to cabazon. And if there's no further questions. Thank you, counsel. The case is submitted.